In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00046-CV


______________________________




J. A. RIGGS TRACTOR COMPANY, Appellant



V.



MICHAEL W. ("MIKE") BENTLEY, Appellee




 


On Appeal from the 62nd Judicial District Court


Hopkins County, Texas


Trial Court No. CV36429




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Justice Carter



O P I N I O N



 J. A. Riggs Tractor Company (Riggs) challenges the Texas court's personal jurisdiction in
this breach of contract action. This is an accelerated interlocutory appeal. See Tex. Civ. Prac. &
Rem. Code Ann. § 51.014 (Vernon Supp. 2006). The underlying case is a contract dispute between
Michael W. Bentley, of Sulphur Springs, Texas, and Riggs, a Texarkana, Arkansas, company.
Bentley alleges $74,000.00 in damages from Riggs' cancellation of a contract for a generator. 

 Riggs raises two main issues on appeal: (1) the trial court erred in finding specific personal
jurisdiction; and (2) the trial court erred in finding general personal jurisdiction. Riggs does not raise
a factual sufficiency argument, but asserts that the facts, as found, do not suffice to confer
jurisdiction. We agree that Riggs lacks constitutionally cognizable minimum contacts with Texas
to support either specific or general personal jurisdiction and that the trial court erred in denying
Riggs' special appearance. 

I. STANDARD OF REVIEW

 "Whether a court has personal jurisdiction over a defendant is a question of law." BMC
Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002). On the underlying standard,
the "plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident
defendant within the provisions of the long-arm statute." Id. at 793. At that point, a "defendant
challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases." Id. 

We conduct a de novo review of the trial court's denial of a special appearance. Am. Type Culture
Collection, Inc. v. Coleman, 83 S.W.3d 801, 806 (Tex. 2002). If we must review the facts
underlying the legal conclusion, we review those for legal and factual sufficiency. Marchand, 83
S.W.3d at 794. Where the trial court issues findings of fact (as it did here), this Court reviews the
trial court's legal conclusions drawn from the facts to determine their correctness. Id. 

II. DUE PROCESS AND PERSONAL JURISDICTION

 A. The Texas Long-Arm Statute

 The Texas long-arm statute allows Texas courts jurisdiction over nonresident defendants
doing business in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 1997). While the
long-arm statute does enumerate certain examples of doing business, it does not provide an exclusive
list. Tex. Civ. Prac. & Rem. Code Ann. § 17.042 ("In addition to other acts that may constitute
doing business, a nonresident does business in this state if . . ." then setting out three acts); see also
Marchand, 83 S.W.3d at 795; Schlobohm v. Schapiro, 784 S.W.2d 355, 256-57 (Tex. 1990). The
statute is construed as extending Texas courts' jurisdiction over nonresident defendants as far as the
federal constitutional requirement of due process permits. Marchand, 83 S.W.3d at 795; Judd,
8 S.W.3d at 441.

 Riggs asserts that no contract was formed so as to confer jurisdiction under the section of the
long-arm statute that defines contracting to perform in Texas as one method of "doing business." 
See Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1). The statute also specifies that "other acts"
may constitute "doing business." Tex. Civ. Prac. & Rem. Code Ann. § 17.042. As just discussed,
the caselaw interprets this statute as extending to the reaches of due process. "[T]he Texas long-arm
statute requirements are satisfied if exercising jurisdiction comports with federal due process
limitations." Coleman, 83 S.W.3d at 806. Bentley's pleadings alleged that Riggs "does business in
Texas." Thus, we do not need to address, as preliminary matters, the underlying questions of
whether there was a formal contract entered or if any contract was to be performed in Texas. Instead,
these will be some of the factors considered in the due-process analysis, by considering the precedent
from the United States Supreme Court and Texas decisions. See Marchand, 83 S.W.3d at 795.

 B. Due Process and "Minimum Contacts"

 "The Due Process Clause of the Fourteenth Amendment limits the power of a state court to
render a valid personal judgment against a nonresident defendant." World-Wide Volkswagen Corp.
v. Woodson, 444 U.S. 286, 291 (1980). A Texas court's personal jurisdiction over a nonresident
defendant is constitutional when two conditions are met: (1) the defendant has established minimum
contacts with Texas, and (2) the exercise of jurisdiction comports with traditional notions of fair play
and substantial justice. Marchand, 83 S.W.3d at 795 (citing Int'l Shoe Co. v. Washington, 326 U.S.
310, 316 (1945)). The "touchstone" of the minimum contacts analysis is purposeful availment, i.e.,
that "the defendant purposefully avails itself of the privilege of conducting activities within the
forum State, thus invoking the benefits and protections of its laws." Michiana Easy Livin' Country,
Inc. v. Holten, 168 S.W.3d 777, 784 (Tex. 2005) (quoting Hanson v. Denckla, 357 U.S. 235, 253
(1958)). 

 The purposeful availment analysis has three components. See Holten, 168 S.W.3d at 785. 
First, the purposeful availment requirement ensures that a nonresident defendant's contacts with the
forum state resulting from the unilateral activities of another party or a third person will not be the
sole basis of haling that defendant into the jurisdiction. Burger King Corp. v. Rudzewicz, 471 U.S.
462, 475 (1985); Holten, 168 S.W.3d at 785. Thus, we look at only the defendant's contacts with
the forum. Holten, 168 S.W.3d at 785. Second, the contacts must be "purposeful" rather than
random, isolated, or fortuitous. Rudzewicz, 471 U.S. at 462; Keeton v. Hustler Magazine, Inc., 465
U.S. 770, 774 (1984); Holten, 168 S.W.3d at 785. In the context of a sale, this purposeful and
deliberate contact is found by "[s]ellers who 'reach out beyond one state and create continuing
relationships and obligations with citizens of another state.'" Holten, 168 S.W.3d at 785 (quoting
Rudzewicz, 471 U.S. at 473). Third, the defendant must have "availed" itself of the jurisdiction by
seeking some benefit, advantage, or profit from the forum state so as to consent to suit there. Holten,
168 S.W.3d at 785. Conversely, "a nonresident may purposefully avoid a particular jurisdiction by
structuring its transactions so as neither to profit from the forum's laws nor be subject to its
jurisdiction." Id. 

 C. Specific vs. General Personal Jurisdiction

 "Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to
either specific jurisdiction or general jurisdiction." Marchand, 83 S.W.3d at 795. Specific
jurisdiction exists when the defendant's alleged liability "arises from or is related to an activity
conducted within the forum." Id. at 796. In other words, the cause of action must arise from, or
relate to, the defendant's purposeful contacts. Schexnayder v. Daniels, 187 S.W.3d 238, 243 (Tex.
App.--Texarkana 2006, pet. dism'd w.o.j.).

 General jurisdiction, on the other hand, may exist even if the cause of action does not relate
to or arise from the nonresident defendant's contacts with the forum, so long as the defendant's
contacts are "continuous and systematic." Helicopteros Nacionales de Columbia, S.A. v. Hall, 466
U.S. 408, 414-15 (1984); Marchand, 83 S.W.3d at 797; Schexnayder, 187 S.W.3d at 243. General
jurisdiction requires a showing that the defendant conducted "substantial activities" within the forum,
which requires a more demanding minimum contacts analysis. Coleman, 83 S.W.3d at 807;
Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 228 (Tex.
1991). Thus, general jurisdiction presents a "more onerous" burden of proof. Marchand, 83 S.W.3d
at 797. In essence, under general jurisdiction, the contacts "should be such as to justify categorizing
the defendant as a resident of this State." Schexnayder, 187 S.W.3d at 243. "[O]ne suggested
method of determining whether general jurisdiction over a defendant truly lies in Texas is by
determining whether a citizen of another state, on a claim for wrongdoing in another state, could
nevertheless properly sue the defendant in Texas courts." Schexnayder, 187 S.W.3d at 243 (citing
Charles Rhodes, The Predictability Principle in Personal Jurisdiction Doctrine: A Case Study on
the Effects of a "Generally" too Broad, but "Specifically" too Narrow Approach to Minimum
Contacts, 57 Baylor L. Rev. 135, 149-55 (2005)). 

III. ANALYSIS: SPECIFIC JURISDICTION

 A. The Contacts

 Riggs is an Arkansas corporation with its principal (and apparently only) place of business
in Arkansas. Riggs does not have Texas residency, a registered agent in Texas, a Texas place of
business, or any employees or servants in Texas. Per its Caterpillar tractor franchise territory
agreement, Riggs has structured its business to sell only in Arkansas. Though Riggs' executive vice
president testified that they can sell to anyone who walks into the shop in Arkansas, he said that, if
a Texas resident called them, they would "hand them off" either by referring them or calling the
Texas Caterpillar dealer (Holt). He stated this was "a rule.  We have to do that. . . . because of sales
territory, franchise territory." 

 Bentley initiated the contact with Riggs. Bentley had been looking for a generator as a
component of his bid on the City of Sulphur Springs' homeland security power failure preparedness
project. Bentley had found Riggs' website, which is "informational in nature. You can go there and
find out information about products." Riggs' marketing manager testified the website makes no sales
promotions and does not solicit business. In other words, it appears that an order cannot be placed
on the website. Accordingly, after finding the website, Bentley telephoned Riggs and requested a
quote on a generator. A Riggs employee "told him I would be happy to quote him, but I would need
to see a set of specifications." (1) Bentley faxed the specifications for the generator to Riggs. (2)

 Riggs faxed back to Texas a quote for $16,090.00. (3) Bentley used this component price in
his project bid and was the city's low bid. In early January 2005, Bentley called Riggs to inform
them he had won the bid and to accept the quote. Riggs requested Bentley complete a credit
application, which would have to be approved in order to transact any business, and faxed the
application to Texas. Riggs says, at this point, they were still not transacting business, not doing
business, because it was just a "prospect, possible purchaser if everything was approved by -- by the
company." Bentley says he completed the application (without mentioning the date he completed
it) and faxed it to Riggs and that, "I know that Riggs Tractor received it because I got a confirmation
sheet." This confirmation sheet is not in the record, and Riggs denies ever receiving the completed
credit application. 

 Nonetheless, in early February 2005, Bentley spoke with Riggs by telephone and Riggs
requested that Bentley get a trailer from Oklahoma to bring to Arkansas to pick up the generator.
Bentley agreed. In late February 2005, Riggs realized it had transposed the "1" and "6" in its quote
for the $61,090.00 generator, told Bentley they misquoted, and demanded more money. In March
2005, Bentley called Riggs to inquire as to delivery, and Riggs informed Bentley the order was
cancelled.  Bentley sued on one count of breach of contract. 

 Bentley was required to arrange to come to Arkansas for delivery. Additionally, the credit
agreement states: "All obligations of the undersigned under this Guaranty are to be performed at the
office(s) of Riggs in Little Rock, Pulaski County, Arkansas." The credit agreement also contains an
optional forum selection clause. It allows that the "VENUE FOR ANY SUCH ACTION [under the
credit agreement] MAY, AT THE SOLE OPTION OF THE PARTY INSTITUTING THE ACTION,
BE IN PULASKI COUNTY, ARKANSAS." 

 B. The Sufficiency of the Contacts

 The trial court found that Riggs' contacts with Texas were purposeful in that "Riggs was
actively participating in the sale" by sending a quote to Texas and sending a credit application to
Texas. However, the court then went on to describe other aspects of "actively participating in the
sale" in support of specific jurisdiction that have nothing to do with contacts with Texas: "by asking
Bentley to pick up a certain trailer in Oklahoma and otherwise make arrangements for pick up and
delivery" (which were all to be done outside of Texas). On these same facts (calling and faxing
Texas and requesting that Bentley go to Oklahoma for a trailer to bring for delivery in Arkansas),
the trial court found that Riggs could have foreseen/reasonably anticipated defending a lawsuit in
Texas. 

 Bentley strives to draw out the evidence to show that Riggs' "active [participation] in the
sale" involved extensive contacts with Texas: Riggs had a website from which a Texas resident
learned of its products; Riggs continued to pursue a sale with Bentley, even knowing that he was not
in Riggs' state/franchise jurisdiction; Riggs faxed a quote to Texas; and Riggs followed up with
several telephone calls to Texas. Bentley asserts that these multiple telephone calls and faxes require
this Court to find jurisdiction through a "straightforward application" of our Schexnayder decision. 
See Schexnayder, 187 S.W.3d 238. However, the minimum contacts analysis "is not susceptible of
mechanical application." Kulko v. Superior Court of Cal., 436 U.S. 84, 92 (1978). 

 Moreover, the Schexnayder case is easily distinguishable. In that case, we found jurisdiction
over Dr. Schexnayder in a medical malpractice action from Schexnayder's direction, via three
telephone calls from Arkansas, of a medical team's actions in Texas. Schexnayder, 187 S.W.3d at
246. Bentley is mistaken that Schexnayder stands for the premise that multiple telephone calls in
and of themselves constitute minimum contacts. Indeed, the Texas Supreme Court has noted
otherwise when it stated that changes in technology, such as cell phones and call forwarding, "have
made reliance on phone calls . . . as proof of purposeful availment obsolete." Holten, 168 S.W.3d
at 791; see also Laykin v. McFall, 830 S.W.2d 266 (Tex. App.--Amarillo 1992, no pet.). Rather,
the actions of Schexnayder in directing the medical team by telephone were the contacts, and those
contacts were the alleged tort, i.e., the alleged negligent conduct. Schexnayder, 187 S.W.3d at
245-46.

 This is not a tort case, where the call/contact constitutes the cause of action. Bentley does
not claim a cause of action arising out of any one of those calls individually. Rather, all of Riggs'
telephone contacts with Bentley in Texas still only relate to one isolated sale of one piece of
machinery on one contract, if that contract exists at all, on which Bentley sued. The law is well
settled that, absent other contacts, there is "no purposeful availment in cases involving isolated sales
solicited by consumers who proposed to use the product in a state where the defendant did no
business." Holten, 168 S.W.3d at 786. 

 Texas generally requires "additional conduct" beyond the facts of a single sale on a single
contract to establish jurisdiction. See id. "Thus, a nonresident that directs marketing efforts to Texas
in the hope of soliciting sales is subject to suit here in disputes arising from that business." Id. at
785. This additional conduct requirement may be met through evidence of a sales and distribution
network the defendant operates in the forum state. Id. (citing Washington, 326 U.S. at 320). 
Evidence of this may include resident salesmen who exhibit samples and solicit orders within the
forum state, advertising in telephone directories in Texas cities, operating an office for sales
information and support, certain activities over the internet, and the design or distribution of products
in the state. Holten, 168 S.W.3d at 785-86.

 This case presents very similar facts to those in Holten: the underlying dispute concerns an
attempted purchase by a Texas resident from a nonresident company; the sale in both cases was
initiated by the Texas purchaser; the nonresident seller in both cases knew the product was going to,
and would be used in, Texas; payment in both cases (in Holten actual payment, and here, anticipated
payment) was in the foreign state. Id. at 784, 787. There are some differences here that indicate
slightly greater contacts between Riggs and Texas than in the Holten case: Michiana did not
advertise in Texas, either on the internet or otherwise, but Riggs did, although neither Michiana nor
Riggs solicited business through advertising to the particular Texas buyer. Id. at 784. There are,
additionally, some differences that demonstrate even less contacts here than in Holten: the sale
actually occurred in Holten, while it was never consummated here; and delivery in Holten was to
Texas, while, here, anticipated delivery was in Arkansas. Id. 

 Unlike Michiana, which did no advertising of any kind in Texas, Riggs did engage in some
marketing-oriented activities in Texas. Riggs advertised in Texas through (a) its website; (b) the
Texarkana telephone book; and (c) mailings sent outside of Arkansas, though the evidence did not
specify that these went to Texas. Since there is no evidence that either the mailings or the telephone
book listings relate to the sale to Bentley, they are not relevant to the specific jurisdiction analysis. 
See id. at 785; Marchand, 83 S.W.3d at 796. The evidence indicates Riggs' website relates to the
Bentley sale and is, therefore, relevant to the specific jurisdiction analysis. 

 "Internet use is characterized as falling within three categories on a sliding scale for purposes
of establishing personal jurisdiction." Michel v. Rocket Eng'g Corp., 45 S.W.3d 658, 677 (Tex.
App.--Fort Worth 2001, no pet.) (citing Jones v. Beech Aircraft Corp., 995 S.W.2d 767, 772 (Tex.
App.--San Antonio 1999, pet. dism'd w.o.j.)). "At one end of the scale are websites clearly used for
transacting business over the internet, such as entering into contracts and knowing and repeated
transmission of files of information, which may be sufficient to establish minimum contacts with a
state." Schexnayder, 187 S.W.3d at 248 (citing Michel, 45 S.W.3d at 677). In the middle are
"interactive" websites, in which a potential customer and a host computer may exchange information,
with jurisdiction in these cases determined by the degree of interaction. Schexnayder, 187 S.W.3d
at 248 (citing Michel, 45 S.W.3d at 677). "On the other end of the spectrum are 'passive' websites
that are used only for advertising over the internet and are not sufficient to establish minimum
contacts, even though they are accessible to residents of a particular state." Schexnayder, 187
S.W.3d at 248 (citing Michel, 45 S.W.3d at 677). The uncontroverted evidence indicated that Riggs'
website was on the "passive" end of the continuum. With candor to this Court, Riggs admitted that
visitors to the site may click on a link to e-mail the webmaster or a manager, a fact not in the record
below. The evidence does not indicate, however, that Bentley actually clicked on those links. Even
recognizing this elevated level of interactivity, "the main thrust of the website is informational in
nature." Schexnayder, 187 S.W.3d at 249. We do not find the website interactivity to rise to a level
indicating Riggs' purposeful availment of the Texas market so as to constitute an "additional contact"
justifying specific jurisdiction. See id.

 In light of the scanty evidence in support of Riggs' purposeful availment, we note that the
forum selection clause in the credit agreement suggests that Riggs anticipated suit in Arkansas and
further suggests that Riggs was not availing itself of the benefit of Texas' laws. Although forum-selection clauses are not dispositive, they "should not be ignored in considering whether a defendant
has 'purposefully invoked the benefits and protections of a State's laws.'" Holten, 168 S.W.3d at 792
(quoting Rudzewicz, 471 U.S. at 482).

 Given the absence of Riggs' constitutionally cognizable contacts with Texas relating to the
sale, we are left with the same scenario the Supreme Court of Texas addressed in Holten: other than
the one-time buyer's fortuitous presence in Texas, and decision to place his order from there, there
is no evidence of any other connection between Riggs, the sale, and the State of Texas. See Holten,
168 S.W.3d at 794. Riggs, therefore, lacks the necessary minimum contacts sufficient to satisfy due
process in invoking specific jurisdiction.

IV. ANALYSIS: GENERAL JURISDICTION

 A. The Contacts

 In support of a finding of general jurisdiction, Bentley introduced, in addition to those
contacts addressed above in support of specific jurisdiction, evidence of Riggs' yellow and white
page listings in (1) 2005-2006 "Texarkana Metro" telephone book; (2) December 2004-December
2005 "Texarkana" telephone book; and (3) 2001-2002 "Greater Texarkana" telephone book. The
evidence shows that all of these telephone books cover both of the Texarkanas, i.e., Texarkana,
Texas, and Texarkana, Arkansas, in addition to surrounding areas in both states. Riggs' marketing
manager testified that it is not possible to list a telephone number in a Texarkana telephone book
without the listing being in a telephone book covering and being distributed in both states. He stated
that he has no control of the distribution of the Texarkana telephone book to the Texas side. He
agreed that the yellow page advertisement in the Texarkana telephone book "is not only foreseeable
but virtually certain that this advertisement is going to find its way into the hands of Texas citizens." 
However, he testified that Riggs' telephone book advertisement was aimed at "[t]he Texarkana
resident in the state of Arkansas" and not at any Texas resident. 

 Bentley also introduced evidence that approximately eight percent of Riggs' outbound calls
from September 2003 to January 2004 were to Texas. At the hearing, Riggs explained that an
Arkansas company might have that many calls to Texas because Texarkana, Arkansas, and
Texarkana, Texas, share a border. He explained that "you can't even call for lunch to be brought in
for a meeting without calling somewhere in Texas to get a lunch catered," depending on what you
would like to have for lunch. He also explained that Riggs' "employees have family and we don't
restrict their calls." Additionally, however, he testified that there are "people from Texas that own
Caterpillar machines" to whom Riggs may return telephone calls. 

 B. The Sufficiency of the Contacts

 In a general personal jurisdiction analysis, "we do not view each contact in isolation. All
contacts must be carefully investigated, compiled, sorted, and analyzed for proof of a pattern of
continuing and systematic activity." Coleman, 83 S.W.3d at 809. In so doing, we look at the
"quality," not just quantity, of the contacts. Id. Even so, we must note that the quantity here is very
low. See generally Hall, 466 U.S. 408 (eighty percent, or $4 million, in sales insufficient for general
jurisdiction); see also Keeton, 465 U.S. at 779 (monthly sale of 15,000 magazines "may not be so
substantial as to support jurisdiction over a cause of action unrelated to those activities" as in general
jurisdiction); Dominion Gas Ventures v. N.L.S., Inc., 889 F.Supp 265 (N.D. Tex. 1995) (four to
seven percent of business' work in Texas insufficient for general personal jurisdiction). An
important factor in assessing the quality of the contacts is to view them in the context of the
structuring of the defendant's transactions. Holten, 168 S.W.3d at 785; Coleman, 83 S.W.3d at 808
(citing Bearry v. Beech Aircraft Corp., 818 F.2d 370 (5th Cir. 1987)). 

 While Riggs' decision to advertise and list itself in the Texarkana telephone books--thus
advertising in both Texas and Arkansas--was not accidental or random, Riggs asserts that the
advertising in Texas resulting from those listings is still fortuitous and/or attenuated. As there
appears to be only one telephone book by any company for both cities (i.e., Texarkana, Texas, and
Texarkana, Arkansas), Riggs essentially asks this Court to ignore that contact with Texas from the
listing as a necessary by-product of the Arkansas listing. The combined telephone book presents one
of what we have previously termed the "unique characteristics of the City of Texarkana as a
community straddling the state line between Texas and Arkansas." Greenwell v. Davis, 180 S.W.3d
287, 296 (Tex. App.--Texarkana 2005, pet. denied). "Although one community, Texarkana consists
of two separate cities located not only in separate counties, but in separate states." Id. Bentley, on
the other hand, would have Texas assert general jurisdiction over any Texarkana, Arkansas, company
that purposefully listed itself in the Texarkana telephone book. As such, all Texarkana, Arkansas,
companies listing themselves in their local telephone book would potentially subject themselves to
suit by any resident of any state on any matter. See Rhodes, 57 Baylor L. Rev. at 149-55. 

 "Incidental" means "1. happening or likely to happen in an unplanned or subordinate
conjunction with something else. 2. incurred casually and in addition to the regular or main
amount." Webster's Unabridged Dictionary 966 (2d ed. 2001) (emphasis added). We find that
Riggs' availment of Texans through its listing in its local telephone book--which includes both
Texas and Arkansas cities--is incidental. Although not "fortuitous," (4) we find that, in a minimum
contacts analysis, incidental contact is attenuated. "Attenuate" means "1. to weaken or reduce in
force, intensity, effect, quantity . . . 2. to make thin; make slender or fine." Webster's Unabridged
Dictionary 133 (2d ed. 2001). In the minimum contacts context "attenuated" refers to those
contacts that are weak, thin, or slender. The incidental contacts with Texas by advertisement in the
combined telephone books are weak and slender contacts in force, intensity, and effect and do not
support general jurisdiction. Cf. Saudi v. S/T Marine Atl., 159 F.Supp.2d 469, 481-82 (S.D. Tex.
2000). 

 Similarly, the evidence of Riggs' outbound telephone calls to Texas does not indicate Riggs'
purposeful availment of that market. The eight percent of calls from Riggs to Texas do not
differentiate between personal and business, purchases and sales, or Riggs-initiated and customer-initiated. The evidence indicates that the calls do not, as a rule, involve Riggs' availment or
solicitation of the Texas market. Again, the contact is largely incidental. Riggs' vice president's
comment that he did not think buying lunch in Texarkana, Texas, constitutes a Texarkana, Arkansas,
company's "doing business" in Texas mirrors the United States Supreme Court's conclusion on the
matter. The Court has noted that "mere purchases, even if occurring at regular intervals, are not
enough to warrant a State's assertion of in personam jurisdiction" in a general jurisdiction analysis. 
Hall, 466 U.S. at 418; see also Saudi, 159 F.Supp.2d at 481-82 (receipt of food and supplies from
Texas fortuitous and insufficient to impose general personal jurisdiction). "Such incidental
commerce does not give rise to general personal jurisdiction." Saudi, 159 F.Supp.2d at 481. In other
words, the focus of the inquiry for general jurisdiction is doing business in, not doing business with,
Texas. 

 Bentley also asserts, in support of general jurisdiction, that Riggs mailed some promotional
materials out of the State of Arkansas. As a rule, Riggs weeded out non-Arkansas zip codes from
its advertising mailings. However, on request, it would mail one out of state. There is no evidence,
though, that any of these were mailed to Texas. As such, evidence of the mailings is insufficient in
supporting a finding that Riggs purposefully availed itself of Texas. Accord Keeton, 465 U.S. at 779
(nationwide magazine insufficient to confer general jurisdiction). 

 Rather than serving as evidence of Riggs' availment of Texas, the fact that Riggs weeded out
non-Arkansas zip codes supports a finding that Riggs structured its business so as to avoid the Texas
market. See, e.g., Holten, 168 S.W.3d at 785. "When a nonresident defendant purposefully
structures transactions to avoid the benefits and protections of the forum's laws, the legal fiction of
consent no longer applies." Coleman, 83 S.W.3d at 808. In addition to the mailings, Riggs referred
clients to Holt of Longview (and vice versa) to maintain a separation of territory. Though Riggs, at
times, would take orders from a Holt dealer in Texarkana, Texas, the evidence indicated that Riggs
insisted on performance of these sales in Arkansas. Riggs' employee testified that "Holt has a
dealership store right across the border, and if that store didn't have parts and they had an extensive
machine down they called us. We would call them back, answer if we had the part, and then they
come over and pick it up." (Emphasis added.) Though Riggs had been given permission and did
continue to pursue the sale with Bentley, in apparent violation of its rule on the territorial agreement,
Riggs still insisted on Bentley traveling to Arkansas to complete the sale. This effort to otherwise
avoid the market should be recognized when evaluating an isolated sale to that market. See Chung
v. NANA Dev. Corp., 783 F.2d 1124, 1128 (4th Cir. 1986). 

 We find that the evidence, in total, shows Riggs' structured effort to avoid that Texas market. 
We are unable to discern--in the telephone books, website, mailings, and outgoing calls and
faxes--a "pattern of continuing and systematic activity" within the State of Texas. Coleman, 83
S.W.3d at 809. The evidence is too insubstantial to show continuous and systematic contact with
Texas in support of general jurisdiction. 

V. CONCLUSION

 Having found that Riggs has insufficient contacts to support Texas' specific or general
jurisdiction, we do not need to analyze the second prong of the due-process analysis, i.e., that
exercising such jurisdiction comports with "fair play and substantial justice." See Rudzewicz, 471
U.S. at 475-76; Marchand, 83 S.W.3d at 795; Guardian Royal Exch. Assurance, 815 S.W.2d at 226. 
The exercise of personal jurisdiction over Riggs, under either a specific or general theory, would
entail Texas' overreaching beyond the limits required by our status as a co-equal sovereign in a
federal system. See Woodson, 444 U.S. at 292; Holten, 168 S.W.3d at 793. 

 We reverse the trial court's judgment denying the special appearance and finding jurisdiction,
and render judgment dismissing the claim for want of jurisdiction.




 Jack Carter

 Justice


Date Submitted: December 6, 2006

Date Decided: December 19, 2006
1. Riggs' vice president testified that Riggs, per its franchise agreement, referred Bentley to the
Texas dealer, Holt. After Riggs notified the Texas dealer, the Texas dealer "said go ahead and do
business with him. We don't want to do business with him." The record does not indicate when in
time this occurred.
2. Riggs said Bentley faxed only a one-page standard Caterpillar generator brochure, while
Bentley says he faxed the full City of Sulphur Springs specifications. 
3. As Riggs denies having received from Bentley proper specifications, Riggs characterizes this
as a "quotation that had a quote, unquote, laundry list of options and asked him if that would cover
the items that he needed. . . . He said yes." 
4. "Occurring by chance." Black's Law Dictionary 680 (11th ed. 2004). 



center 3.25in'>                                                              
                                    

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                        Memorandum Opinion by Chief Justice Morriss








                                                      MEMORANDUM OPINION

 

            The City of
Greenville Police Department (City) towed S. Wilts vehicle from his real
property after stopping him for a traffic offense.  Wilt sued the City to recover the costs
charged to him for the towingthe sum of $126.65asserting that the City did
not have probable cause to tow his vehicle.

            After Wilt
was the first and only witness[1]
in his case in chief in a bench trial de novo before County Court at Law Number
1 of Hunt County, the City was awarded a directed verdict.  Wilt appeals from that directed verdict.[2]

            Because,
under the standard of review of a directed verdict, there was evidence of
probative force to at least raise a fact issue on Wilts claim to allow the
claim to survive a motion for directed verdict, we must reverse the directed
verdict and remand this cause to the trial court for further proceedings.

            A trial
courts directed verdict is reviewed de novo. 
John v. Marshall Health Servs.,
91 S.W.3d 446, 450 (Tex. App.Texarkana 2002, pet. denied) (citing Knorpp v. Hale, 981 S.W.2d 469, 471 (Tex.
App.Texarkana 1998, no pet.)).  When
reviewing the directed verdict in this case, we must consider the evidence in
the light most favorable to Wilt, disregarding all contrary evidence and
inferences, and giving Wilt the benefit of all reasonable inferences raised by
the evidence.  Id. (citing Qantel Bus. Sys.
v. Custom Controls Co., 761 S.W.2d 302, 303 (Tex. 1988)).  If there is any evidence of probative force to
raise a fact issue on the material question of probable cause, a directed
verdict is improper.  Id.

            City of
Greenville Police Officer Herron stopped Wilt for a traffic violation.  After driving a short distance, Wilt finally
came to rest in the driveway of a house he owned, but did not live in, in
Greenville.  The officer arrested Wilt
for the traffic violation.  Because
Wilts drivers license address reflected that he lived in nearby Quinlan,
Texas, and Wilt confirmed his residence as the Quinlan address, the officer towed
Wilts vehicle from his property.

            Alleging
that the vehicle was improperly towed, Wilt requested a Tow Hearing pursuant
to Chapter 2308 of the Texas Occupations Code, listing the City as the
respondent.  Wilt complained that,
because he had previously filed a trespass complaint with the City proving he
owned the Greenville house and told the officer the house was his, the officer
should not have towed the vehicle.  

            Greenville
City ordinances authorize police officers to tow vehicles under certain
circumstances.  Greenville, Tex.,
Ordinance Sec. 6.07.008 (1990).  When a vehicle is towed pursuant to a police pull, the owner of said
vehicle shall be afforded the right to a hearing as provided in Texas
Transportation Code, chapter 685.  Greenville,
Tex., Ordinance Sec. 6.07.011(a) (1990). 
Chapter 685 of the Texas Transportation Code was renumbered as
Chapter 2308 of the Texas Occupations Code.  Section 2308.452 states that the owner of a
vehicle that has been removed and placed in a vehicle storage facility . . .
without the consent of the owner or operator of the vehicle is entitled to a
hearing on whether probable cause existed for the removal and placement.  Tex.
Occ. Code Ann. § 2308.452 (Vernon Supp. 2010).

            The primary
issue at a hearing conducted under Chapter 2308 is whether probable cause
existed for the removal and placement of the vehicle.  Tex.
Occ. Code Ann. §§ 2308.451.452 (Vernon Supp. 2010).  Jurisdiction to conduct these probable cause
tow hearings is given to the justice of the peace[3]
or magistrate in the jurisdiction from which the vehicle was removed.  Tex.
Occ. Code Ann. § 2308.453 (Vernon Supp. 2010).  If the court conducting the hearing finds
there was probable cause for the authorization of the removal and storage of
the vehicle, the person who requested the hearing shall pay the costs of the
removal and storage.  Tex. Occ. Code Ann. § 2308.451(a).  On the other hand, if the court finds no
probable cause for the removal and storage of the vehicle, the towing company,
vehicle storage facility, or parking facility owner or law enforcement agency
that authorized the removal shall pay the costs of removal and storage or
reimburse the owner or operator for removal and storage costs already paid by
the owner or operator.  Tex. Occ. Code Ann. § 2308.451(b).

            Probable
cause, in the context of a tow hearing, exists when reasonably trustworthy
facts and circumstances within the knowledge of the officer on the scene would
lead a man of reasonable prudence to believe that the instrumentality of a
crime or evidence of a crime will be found.[4]
 Senter
v. City of Dallas, No. 05-05-01416-CV, 2006 WL 3218548, at *2 (Tex.
App.Dallas Nov. 8, 2006, no pet.) (citing
Small v. State, 977 S.W.2d 771, 774 (Tex. App.Fort Worth 1998, no
pet.)).  Under City of Greenville
ordinances, an officer is also authorized to impound a vehicle [w]hen any
vehicle is otherwise legally parked so as to block the entrance to any private
driveway or [w]hen any such officer arrests any person driving or in control
of a vehicle for an alleged offense and such officer is by this article or
other law required to take the person arrested immediately before a magistrate
and it is unsafe to leave the vehicle unattended at the scene.  Greenville, Tex., Ordinance Sec. 6.07.008(2),
(6).  Probable cause is a flexible,
common sense standard requiring only a probability of suspect activity rather
than an actual showing of such activity.  Id.  Under the totality of the circumstances
approach, law enforcement officers are permitted to draw logical inferences and
make intelligent deductions from the totality of the circumstances.  Id. (citing
Jackson v. State, 745 S.W.2d 4, 10
(Tex. Crim. App. 1988)).

            The only
evidence at trial came from Wilts testimony and two exhibits admitted into
evidence, one of which was stipulated. 
No contrary evidence or testimony was presented.  From Wilts presentation of his case in
chief, there was no evidence of any articulable facts that would cause the
officer to believeand in fact no evidence that the officer did believethe
instrumentality of a crime or evidence of a crime would be found if he towed
the vehicle.  Wilt was arrested for a
traffic offense.  Although the officer
could tow the vehicle if it blocked the entrance to any private driveway, the
only evidence during Wilts case in chief was to the effect that the property
belonged to Wilt and that Wilt notified the officer of that fact.

            The officer
would have been authorized to tow the vehicle on still another basis; that is,
if he was required to take Wilt immediately before a magistrate and it was
unsafe to leave the vehicle unattended at the scene.  During Wilts case in chief, however, no
evidence was adduced of either of those conditions.

            A person
arrested for a misdemeanor traffic violation is required to be taken
immediately before a magistrate if arrested on a charge for failure to stop in
the event of an accident causing damage to property, if he or she demands an
immediate appearance before the magistrate, or if he or she refuses to make a
written promise to appear in court.  Tex. Transp. Code Ann. § 543.002
(Vernon 1999).  By the time the trial
court granted the Citys motion for directed verdict, there had been no
evidence supporting any of those alternatives. 
Other than Wilts testimony that he was arrested for a misdemeanor
Class C fineable offense, the record does not clarify the nature of the
traffic offense.  

            There was
evidence that the real property from which the vehicle was towed was not
occupied by any individual.  But for that
evidence, nothing suggests any danger in leaving the vehicle there,
untowed.  No evidence in this record
establishes the type of neighborhood or that there would be any expected danger
of a parked car in those environs.

 

            We are
required to review the grant of a motion for directed verdict, such as this
one, by viewing the evidence in a light most favorable to Wilt.  Because we are guided by the standard of
review, we view Wilts evidence as at least raising a fact issue.  We sustain Wilts point of error.

            Accordingly,
we reverse the trial courts judgment and remand for proceedings consistent
with our opinion.  

 

 

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

Date Submitted:          April
26, 2011

Date Decided:             April
29, 2011

 

 

 

 











[1]A
written statement from a neighbor was admitted as Plaintiffs Exhibit 1 and was
stipulated to by the City.  That
statement included a sentence, When they pulled [Wilt] over he was on his
property at 732 Forrester St, Greenville, TX. 
Also admitted, marked as Plaintiffs Exhibit 2, was a document titled
Criminal Trespass Notice and dated April 8, 2010, directed from Wilt
describing as his own property 730, 732, and 734 Forrester Street in
Greenville, a notice endorsed by Officer Herron, the same officer that stopped
Wilt and directed that his vehicle be towed. 


 





[2]Citing
the low amount in controversy, the City declined to file a formal brief, but
asserted in a letter that probable cause to tow was supplied by the fact that
Wilts home address was different from the address from which the vehicle was
towed.





[3]The
justice of the peace presiding over the initial hearing concluded that
probable cause existed for removal and impoundment of [Wilts] vehicle.  Wilt appealed this decision to the trial
court from which this appeal is taken.  That
court, after presentation of only Wilts case in chief, entered judgment in
favor of the City on the directed verdict motion of the City.  





[4]The
City argues that, because Wilt requested the tow hearing, the burden of proof
was on him.  Tex. Occ. Code Ann. § 2308.458  (Vernon Supp. 2010).  While correct, the uncontested evidence was
that the officer towed the vehicle from Wilts driveway when there was no
evidence requiring the vehicle to be towed.